**SO ORDERED.**

**SIGNED this 2nd day of April, 2013.**



*Dale L. Somers*
Dale L. Somers
United States Bankruptcy Judge
_____

**Designated for on-line use but not print publication**
**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF KANSAS**

**In re:**

**ROGER ALLEN CREASON and**              **CASE NO. 09-22647**
**PATRICIA GALE CREASON,**               **CHAPTER 13**

           **DEBTORS.**

**MEMORANDUM OPINION AND JUDGMENT**
**REGARDING TURNOVER OF ESTATE'S INTEREST IN**
**DEBTORS' INTEREST IN GMC, LLC, AND**
**THE TRUSTEE'S OBJECTION TO GMC, LLC'S PROOF OF CLAIM**

On September 20, 2012, the Court held an evidentiary hearing on two related substantive matters: (1) The Chapter 13 Trustee's objection to claim number 9 filed by GMC, LLC (GMC);[1] and (2) the Chapter 13 Trustee's motion for turnover of the interest of Debtors Roger Allen Creason and Patricia Gale Creason (Debtors) in GMC, comprised

---

[1] Dkt. 28.

of proceeds of the liquidation of GMC.[2] The Court has jurisdiction.[3] Resolution of both matters turns upon two matters: (1) the amount of GMC's claim against Debtors as guarantors of the obligations of Johnson County Drywall Supply, Inc. (Drywall), to GMC; and (2) Debtors' claim, as holders of one-third of the GMC membership interests, in the proceeds of the liquidation of GMC's assets. Having carefully considered the evidence, the exhibits, the arguments and briefs of counsel, the Court holds that Debtors' interest in GMC is $189,681.00, that GMC has a claim for $151,679.61 secured by Debtors' membership interest, and that the Trustee is entitled to turnover of $38,001.39, the difference between the value of Debtors' interest and Debtors' liability.

**FINDINGS OF FACT.**

Debtors Roger and Patricia Creason are the sole owners of the stock of Drywall. Drywall conducted its business on real property owned by GMC. Debtors also are the owners of an undivided 1/3 interest in GMC.[4] Two other individuals, Frank A. Glorioso and William L. Morris, are also holders of undivided 1/3 interests in GMC. Until

---

[2] Dkt. 57.

[3] This Court has jurisdiction pursuant to 28 U.S.C. §§ 157(a) and 1334(a) and (b), and the Standing Order of the United States District Court for the District of Kansas that exercised authority conferred by § 157(a) to refer to the District's bankruptcy judges all matters under the Bankruptcy Code and all proceedings arising under the Code or arising in or related to a case under the Code, effective July 10, 1984. An objection to a proof of claim and a motion for turnover are core proceedings which this Court may hear and determine as provided in 28 U.S.C. § 157(b)(2). There is no objection to venue or jurisdiction over the parties.

[4] Debtors' interest in GMC is titled in the name of the Roger A. Creason and Patricia A. Creason Revocable Trust. The distinction between Debtors and their trust is not material to the issues before the Court and will be ignored.

December 2007, Glorioso and Morris were also owners of Drywall stock, although they had retired in approximately 2002.

On March 31, 2006, Drywall entered into a written lease with GMC. On December 27, 2007, in conjunction with Glorioso and Morris's entering into an agreement for redemption of their Drywall stock, Drywall and GMC entered into an amendment extending the lease for an additional thirty-three months. On the same date, Debtors entered into a guaranty in favor of GMC, Glorioso, and Morris, personally guarantying Drywall's obligations to GMC under the lease as amended. Debtors agreed to secure their personal guaranty by a pledge of their interest in GMC, and executed a security agreement and a pledge agreement to accomplish this result. Also on that date, Roger Creason, Gloriso, and Morris executed an amendment to the GMC operating agreement providing that the rental income paid to GMC by Drywall would be distributed on an equal basis to Glorioso and Morris for 48 months from January 1, 2008, and that Roger Creason would not be entitled to receive any portion of such rental income.

On August 17, 2009, Debtors filed for protection under Chapter 13, and Drywall filed for protection under Chapter 7. Drywall closed its business. Steve Rebein, the Chapter 7 Trustee of Drywall, sold all of Drywall's assets and vacated the leased premises. The lease with GMC was rejected.

W.H. Griffin (Trustee) was appointed Chapter 13 Trustee in this bankruptcy. Debtors' Schedule B lists a 1/3 interest in GMC, estimated to have a value of $225,000. On December 8, 2009, GMC filed a proof of claim for $66,600.75, which was amended

on April 30, 2012, to a secured claim of $221,600 for "breach of lease/guarantee." On January 26, 2010, the Trustee objected to GMC's proof of claim, stating it should not be allowed because it "will be paid upon liquidation of Debtor's interest in GMC, LLC."[5] On March 31, 2011, GMC sold its last asset, the premises leased to Drywall, for net proceeds of $569,045.19. On April 5, 2011, the Trustee filed the motion for turnover of Debtors' interest in the sale proceeds.

Trial on the motion for turnover was combined with trial on the objection to GMC's proof of claim. At trial, GMC contended that Debtors' debt to GMC based upon their guaranty of the debts of Drywall and their share of GMC's expenses exceeded their interest in the sale proceeds, so that the Trustee's motion should be denied. The Trustee and Debtors contend that Debtors are owed $65,935 by GMC. Debtors claim their interest in GMC's assets exceeds their liability to GMC based upon: (1) a challenge to some of the elements of GMC's claim against them; and (2) a proposed construction of the rent allocation provision in the amended operating agreement that would make it not applicable to Debtors' liability under the guaranty.

**DISCUSSION.**

GMC is being liquidated, and its only remaining asset is the net proceeds from the sale of its real property. There is no dispute that Debtors, as the owners of a one-third

---

[5] Dkt. 28.

interest in GMC, are entitled to $$189,681.00, which is one-third of $569,045.19,[6] the net proceeds from the sale of GMC's real property. The controversy is about the amounts which should be offset from Debtors' share for two general categories of claims:

(1) Debtors' liability to GMC as guarantors of Drywall's lease obligations; and

(2) Debtors' liability for expenses of GMC.

**A. Debtors' Liability as Guarantors of Drywall's Obligations under the GMC Lease.**

**1. Debtors Personally Guarantied Drywall's Lease Payments.**

The guaranty unconditionally obligates Debtors to pay all amounts owing to GMC under the lease between GMC and Drywall. When Drywall filed for bankruptcy relief, it rejected the lease with GMC, the lease was terminated, and GMC as lessor became entitled to damages. Debtors do not contest their liability for GMC's damage claim, but they do challenge the amount of that liability.

**2. Drywall's Liability to GMC Is Determined by State Law, Subject to the Cap of 11 U.S.C. § 502(b)(6).**

As stated above, Drywall, the lessee of GMC's property, filed for relief under Chapter 7. The lease was not assumed and was terminated. GMC asserts it was damaged by Drywall's termination of the lease. Under 11 U.S.C. § 502(b)(6), a lessor's damage claim is subject to a cap — it is disallowed to the extent that —

---

[6] The Court is aware that 569,045.19 divided by 3 is actually 189,681.73, but the parties have not concerned themselves with the extra 73 cents, and the Court will follow their lead.

5

> (6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds —
>> (A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of —
>>> (i) the date of the filing of the petition; and
>>> (ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus
>>
>> (B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates.

"In determining the landlord's claim for rejection of a lease, the court should first calculate the amount of the claim under applicable state law without application of any bankruptcy limitation and then apply the cap under Code § 502(b)(6)."[7]

The Tenth Circuit has not addressed the meaning of "rent reserved by such lease" under § 502(b)(6)(A), which defines the amount of the cap that is applicable in this case. A leading test for determining the rent reserved was formulated by the Bankruptcy Appellate Panel for the Ninth Circuit in *McSheridan*.[8] After thoroughly reviewing the case law, the *McSheridan* court adopted the following three-part test for finding that a charge constitutes "rent reserved," which this Court finds to have been well reasoned.

> 1) The charge must: (a) be designated as "rent" or "additional rent" in the lease; or (b) be provided as the tenant's/lessee's obligation in the lease;

---

[7] 3 William L. Norton, Jr., and William L. Norton III, *Norton Bankruptcy Law & Practice 3d*, § 48:36 at p. 48-94 (Thomson Reuters/West 2012).

[8] *Kuske v. McSheridan (In re McSheridan)*, 184 B.R. 91 (9th Cir. BAP 1995), overruled in part on other grounds *Saddleback Valley Cmty. Church v. El Toro Materials Co. (In re El Toro Materials Co.)*, 504 F.3d 978, 981-82 (9th Cir. 2007).

    2) The charge must be related to the value of the property or the lease thereon; and
    3) [T]he charge must be properly classifiable as rent because it is a fixed, regular or periodic charge.[9]

One of the cases cited was *Rose's Stores*,[10] a decision of the Bankruptcy Court for the Eastern District of North Carolina which had adopted a two-part test. That test requires that "the charge must be provided for in the lease as the tenant's obligation, though it need not be denominated as rent," and "the charge must be related to 'the value of the property and the value of the lease thereon.'"[11] Under this test, charges "generally related to the tenant's use of the premises rather than to the value of the property or the leasehold estate," such as general maintenance and utilities, "should not be included in the § 502(b)(6) calculation."[12]

  Under § 502(b)(6), all of the damages claimed to have resulted from the termination of the lease are subject to the cap, and claims for such damages in excess of the cap are not allowed. However, a claim for rent due prepetition not resulting from the termination is not subject to the cap.[13] When presenting its damage claim in GMC exhibit 402, GMC states that its claim for expenses related to the breach of the lease are "Limited to One Year Period Following Bankruptcy Filing." GMC has thereby correctly

---

[9] *Id*. at 99-100.

[10] *In re Rose's Stores, Inc.*, 179 B.R. 789 (Bankr. E.D.N.C. 1995).

[11] *Id*. at 791 (quoting *In re Heck's Inc.*, 123 B.R. 544, 546 (Bankr. S.D. W.Va. 1992)).

[12] 179 B.R. at 791.

[13] 11 U.S.C. § 502(b)(6)(B).

7

acknowledged the applicability of the cap to Debtors' liability as the guarantors of Drywall's lease obligations.[14]

At trial, GMC claimed that $196,949.41[15] is owed as damages by Debtors for termination of the lease. GMC's claim is comprised of the following elements:

| | |
|---|---:|
| Lease payments for one year - Sept. 2009 to August 2010 | $100,000.00 |
| Real estate taxes (for 2008 through August 2010) | 52,740.16 |
| Utilities | 550.00 |
| Insurance | 5,995.75 |
| Legal and accounting | 8,740.22 |
| Maintenance/mowing/repairs | 8,776.78 |
| Building management | 20,146.50 |

Debtors do not challenge the first four elements of these amounts claimed under state law. Although they do challenge the last three elements, for the reasons explained below, the Court need not determine if these amounts are owed under state law. The Court will therefore apply the § 502(b)(6)(A) cap to the total damages GMC claims, $196,949.41.

The Court next determines the amount of "rent reserved" for purposes of the § 502(b)(6)(A) cap.[16] The lease between Drywall and GMC obligates Drywall to pay a base "rent" plus "additional rent," defined to be "all charges required to be paid by Tenant

---

[14] *See In re Episode USA, Inc.*, 202 B.R. 691, 695-96 (Bankr. S.D.N.Y. 1996) (holding § 502(b)(6) applies to debtor-guarantors).

[15] In its exhibit 402 admitted at trial, GMC claimed termination damages of $201,449.41, which included total taxes of $57,240.16. In its post-trial brief, dkt. 113 at 4, GMC acknowledged that it made an error in the amount of taxes by transposing two numbers and the correct amount of taxes is $52,740.16, which makes the total claim $196,949.41.

[16] In this case, all of the elements of the damage claim are amounts owed under the lease, so the determination of the cap requires examination of the elements of the damage claim. In other circumstances, the damages for termination could be measured in a different manner, such as profits lost when, after the termination, the premises were leased to a third party.

8

under this Lease."[17] The additional charges which were the responsibility of Drywall under the lease included utilities, taxes, maintenance and repair costs, insurance costs, and legal costs, including attorney fees. Thus, all of the elements claimed by GMC satisfy the first part of the *McSheridan* test. But only some of the elements satisfy the second part of the test that they be related to the value of the real property or the lease. The elements of monthly rent, taxes, and insurance satisfy this requirement, but the claims for utilities, maintenance/mowing/repair, and building management relate to Drywall's occupancy of the premises, not to the value of the lease. In addition, the utilities, maintenance/mowing/repair, and building management elements, as well as the charge for legal and accounting expenses, do not satisfy the third part of the test because they are not fixed, regular, or periodic payments due the landlord. GMC claims interest on past-due payments, but interest, although provided for by the lease, is not the type of expense included in the *McSheridan* test. Therefore, the Court concludes that only the claims for one year of rent, taxes, and insurance are included in the cap on termination damages imposed by § 502(b)(6)(A).

There is no dispute that the rent included in the cap is $100,000, the rent for one year following termination of the lease. There is also no dispute that $5,995.75 is the correct amount for insurance. Although the parties agree that the total taxes for the period 2008 through August 2010 are $52,740.16,[18] a portion of this amount must be excluded

---

[17] Exh. 403.

[18] Dkt. 113 at 4; dkt. 111 at 4.

9

from the cap since it is for periods outside of the one-year period between September 2009 and August 2010. Only those taxes owed by Drywall during the year immediately following termination may be included in the cap. They are the taxes owed by Drywall on December 20, 2009, for the first half of the 2010 taxes ($12,410.81)[19] and a pro rata share of the second half of the 2010 taxes, stated to be $4,136.94,[20] for a total of $16,547.75. To the extent that the taxes Drywall owed to GMC under the lease include taxes due before Drywall filed for bankruptcy relief,[21] they are a prepetition claim not subject to the § 502(b)(6)(A) cap.

To summarize, GMC claims $196,949.41 for expenses related to termination of the lease. Under § 502(b)(6)(A), the amount of these damages is capped at the amounts due during one year following the termination for base rent ($100,000), taxes ($16,547.75), and insurance premiums ($5.995.75). The remaining elements of the damage claim are disallowed because of the cap,[22] with the exception of the taxes which were due

---

[19] Exh. 402.

[20] *Id.*

[21] The testimony at trial was that the second half of the 2008 taxes was past due when Drywall filed for relief (Tr. 83, l. 20 to 84, l. 4), yet the damage calculation as shown as exhibit 402 includes taxes for all of 2008 and both halves of 2009. It is impossible for the Court to determine from the record the correct allocation of the total taxes claimed to the categories of those due prepetition, those due within one year of termination of the lease, and those due thereafter.

[22] In a post-trial brief, Debtors and the Trustee assert that the following adjustments should be made to GMC's claim: a $4,500 reduction in taxes because of a transposition of numbers; a $7,611.42 reduction in attorney fees which were not itemized; $3,273.66 for maintenance/mowing/repairs; and $20,146.50 for building management. Since the Court finds that none of the elements, except the taxes, can be recovered because of the cap, the Court does not rule on these objections. In its post-trial brief, dkt. 113 at 4, GMC acknowledged that it made an error in the amount of taxes claimed by transposing two numbers, and the correct amount is $52,740.16.

Case 09-22647   Doc# 125   Filed 04/02/13   Page 10 of 15

prepetition. The excluded elements total $38,213.50, so the total recovery under Debtors' guaranty of Drywall's prepetition obligations under the lease and for damages for termination is $158,735.91. During the Drywall bankruptcy, the Chapter 7 Trustee paid GMC $10,000 rent for the time the leased premises were occupied. GMC proposes that Debtors be given credit for this payment,[23] thereby reducing their obligation to $148,735.91.

### B. The Claim for Expenses of GMC.

In addition to Debtors' liability as guarantors of Drywall's lease obligations, GMC also claims Debtors are liable, as one-third owners of GMC, for certain expenses of GMC. The expenses total $8,831.11, for such matters as insurance, appraisals, surveying, and building maintenance not attributable to termination of the lease. Debtors did not challenge this portion of GMC's claim.[24] Debtors' obligation for one-third of the expenses is $2,943.70, an amount which should be offset from the value of their interest.

### C. Calculation of the Proper Division of Assets.

The primary dispute in calculating the division of assets is whether the lease termination damages (comprised primarily of rent for one year) is an asset of GMC to be allocated equally to each of the three co-owners, or whether that asset should be allocated

---

[23] Exh. 401-A.

[24] Debtors and the Trustee in their post-trial brief (dkt. 111) contend most of these expenses should be disallowed as not covered by the guaranty. The Court agrees that they are not within the guarantied liabilities of Drywall. But because GMC is not claiming these expenses under the guaranty, this does not provide a defense.

11

only to Glorioso and Morris under the terms of the amended operating agreement. As stated above, the amendment to the operating agreement states that for the period of 48 months from January 1, 2008, "rental income paid to the Company [GMC] by Johnson County Drywall" shall be divided equally between Glorioso and Morris, and Roger Creason "shall not be entitled to receive a portion of such rental income" during that period.

Roger Creason admits he signed the amendment to the operating agreement, but he and the Trustee contend that the amounts owed under Debtors' guaranty of Drywall's obligation to GMC are not rental income for purposes of the amendment. They argue that the amendment applies only to rents paid by Drywall to GMC and that payments made by a third party, such as Debtors, for termination damages are not covered. Reliance is placed upon the principle of Kansas law that contracts are "enforced according to their plain, general, and common meaning in order to insure the intentions of the parties are enforced."[25] They contend that because the amendment is complete and unambiguous, the Court must determine the intent of the parties from "the four corners" of the amendment, "without regard to extrinsic or parole evidence."[26]

---

[25] Dkt. 111 at 3-4 (quoting *Bunnell Farms Co. v. Samuel Gary, Jr. & Assocs.*, 30 Kan. App. 2d 739, 741-42, 47 P.3d 804, 806 (2002), *which was quoting Hall v. JFW, Inc.*, 20 Kan. App. 2d 845, 848, 893 P.2d 837 (1995)).

[26] *Id*. at 4 (*quoting Bettis v. Hall*, 852 F. Supp. 2d 1325, 1334 (D. Kan. 2012), *which was quoting Kay–Cee Enter., Inc. v. Amoco Oil Co.*, 45 F. Supp. 2d 840, 843 (D. Kan. 1999)).

12

GMC responds that Debtors' argument fails for two reasons.  First, there is no language in the amendment stating that payment *only* from Drywall is to be divided between Morris and Glorioso.  Second, it argues that adopting Debtors' interpretation would reward them for the breach of Drywall's obligation to pay rent.  It points out that the amendment and the guaranty were executed in conjunction with the agreement for redemption of Glorioso's and Morris's stock in Drywall (resulting in Debtors becoming the sole owners of Drywall) and the grant to Drywall of an option to purchase the real property leased by GMC.  According to GMC, Debtors' giving up their claim to one-third of the rent for 48 months was part of the consideration for these benefits.  GMC presented evidence that the allocation of rent solely to Glorioso and Morris was suggested in a draft redemption agreement presented by Debtors, which included the proposal that "[m]onthly rent shall remain the same, but it shall be distributed by GMC, LLC to only Glorioso and Morris."[27]  Reviewers of the proposal suggested that this allocation be removed from the agreement so it would not be construed as additional consideration for the stock, which would make it subject to income taxation.[28]

The Court finds GMC's arguments more persuasive.  Debtors' obligations under the guaranty are in satisfaction of Drywall's liability for termination of the lease.  The amount owed is calculated by reference to the rent owed under the lease.  The circumstances of the amendment to the operating agreement evidence that Glorioso and

---

[27] Exh. 415 at 4.

[28] *Id* at 1.

13

Morris, but not Debtors, were to benefit from the value of the lease. The allocation stated in the amendment to the operating agreement is applicable to "rental income"; the phrase "paid to the Company by Johnson County Drywall Supply" defines the applicable lease, but does not serve to limit the rental income so allocated to that paid directly by Drywall, as opposed to on Drywall's behalf.

### D. Calculation of the Estate's Interest in GMC's Assets.

GMC's claim against Debtors as guarantors is secured by Debtors' GMC membership interest. It is therefore appropriate to offset the amount owed to GMC by Debtors against Debtors' share of the liquidation assets, which are the net proceeds from the sale of GMC's real property. Likewise, GMC's claim for expenses is an obligation of Debtors as holders of an interest in GMC, and is properly offset against the net proceeds from the sale of GMC's real property.

The Court therefore holds that the estate's interest is calculated as follows:

| | |
|---|---:|
| One-third interest in net proceeds from sale | $189,681.00 |
| Less obligations under guaranty | ($148,735.91) |
| Less one-third of GMC's expenses | (2,943.70) |
| Total owed to Debtors from sale proceeds | $38,001.39. |

**CONCLUSION.**

For the forgoing reasons, the Court holds that GMC has a claim against Debtors for $151,679.61, secured by Debtors' one-third interest in GMC, which has a value of

14

$189,681.00. The Trustee's turnover motion is granted as to $38,001.39, the value of Debtors' interest after the offset of GMC's claim.

The foregoing constitute Findings of Fact and Conclusions of Law under Rules 7052 and 9014(c) of the Federal Rules of Bankruptcy Procedure, which make Rule 52(a) of the Federal Rules of Civil Procedure applicable to this matter.

**JUDGMENT.**

Judgment is hereby entered sustaining the Trustee's objection to GMC's proof of claim. The Court holds that GMC has a secured claim for $151,679.61, payable by offset against $189,681.00, the value of Debtors' membership interest in GMC.

Judgment is hereby entered sustaining the Trustee's motion for turnover. The Court holds that GMC shall turn over $38,001.39, the difference between the value of Debtors' membership interest in GMC and the amount owed by Debtors to GMC.

**IT IS SO ORDERED.**

# # #

15

Case 09-22647    Doc# 125    Filed 04/02/13    Page 15 of 15